**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 21-7443**

───────────────

KEITH W.R. LOWE,

        Plaintiff - Appellant,

      v.

DR. SHERRI JOHNSON, physician for Wexford, sued in her individual capacity;
DAVID BALLARD, former Warden of Mount Olive Correctional Complex;
JAMES RUBENSTEIN, former Commissioner of WVDOC, sued in his individual
and official capacities,

        Defendants - Appellees.

───────────────

Appeal from the United States District Court for the Southern District of West Virginia, at
Charleston.  Thomas E. Johnston, Chief District Judge.  (2:17-cv-02345)

───────────────

Submitted:  September 26, 2023                     Decided:  November 1, 2023

───────────────

Before WILKINSON, GREGORY, and THACKER, Circuit Judges.

───────────────

Affirmed in part, vacated in part, and remanded by unpublished per curiam opinion.

───────────────

Keith W.R. Lowe, Appellant Pro Se.  Michelle D. Baldwin, Melvin F. O'Brien, DICKIE,
MCCAMEY & CHILCOTE, P.C., Wheeling, West Virginia; John P. Fuller, BAILEY &
WYANT, PLLC, Charleston, West Virginia, for Appellees.

───────────────

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This case comes before us for a second time. Keith W.R. Lowe, a West Virginia inmate, filed a 42 U.S.C. § 1983 complaint and alleged, among other claims, deliberate indifference to his serious medical needs arising from the discontinuation and temporary deprivation of anti-seizure medication. The district court dismissed his complaint for failure to state a claim. On appeal, we vacated the district court's order and remanded for further proceedings after concluding that Lowe had plausibly alleged a deliberate indifference claim against Dr. Sherri Johnson and a supervisory liability claim against prison officials James Rubenstein and David Ballard. *Lowe v. Johnson*, 797 F. App'x 791 (4th Cir. 2020) (No. 19-6353). On remand, Dr. Johnson, Rubenstein, and Ballard (collectively, "Defendants") moved for summary judgment. The district court accepted the magistrate judge's findings and recommendation, granted summary judgment in favor of Defendants, and dismissed Lowe's claims of deliberate indifference to his serious medical needs. We affirm in part, vacate in part, and remand for further proceedings.

I.

In 2010, a physician for Wexford Health Sources, the medical provider for inmates at Lowe's prison, diagnosed Lowe with epilepsy after Lowe suffered several seizures. The physician prescribed Lowe Dilantin three times daily to control the seizures. There is no doubt that epilepsy is a serious medical need. According to Dr. Johnson's medical expert, Dr. Constantino Amores, Dilantin is an excellent anti-seizure medication. But a patient receiving Dilantin should have blood tests to determine the level of Dilantin in the patient's blood stream. According to Dr. Amores, a low level of the medication in the blood puts

2

the patient at risk of seizure recurrence, and a high level in the blood may put the patient's liver and kidneys at risk. Dr. Amores noted that Dilantin controlled Lowe's seizures until Lowe refused to have his blood drawn. Lowe had needle phobia and, in October 2014, refused to have blood drawn against medical advice. This came to a head in January 2015, when Dr. Johnson told Lowe that if he did not have his blood drawn, she would discontinue Dilantin and prescribe Keppra in its place. Keppra does not require blood tests.

On April 2, 2015, Dr. Johnson discontinued Lowe's prescription for Dilantin without notice to Lowe, but she did not immediately prescribe Keppra. Lowe was concerned that he was at risk of seizures because his epilepsy was not being medically treated. Lowe spoke to Dr. Johnson to request a prescription for an anti-seizure medication. He also wrote Rubenstein and Ballard to notify them that Dr. Johnson was not treating his epilepsy.

On April 6, 2015, Lowe suffered what he believed to be an epileptic seizure because he woke in a puddle of urine. Lowe submitted a sick-call request, spoke with Dr. Johnson, and informed her of the seizure. Dr. Johnson told Lowe that she would not prescribe Dilantin until he had his blood drawn. Lowe agreed to have his blood drawn, and Dr. Johnson told him that a nurse would draw his blood the next day. But no nurse came to draw Lowe's blood.

On April 11, 2015, Lowe had another seizure. He woke lying in a puddle of his blood and had defecated and urinated on himself. Prison guards responded to his call for assistance and saw that his face and upper body were covered in blood. A nurse suspected that Lowe had a seizure while sleeping and fell out of bed, striking his head and face on

3

the concrete floor and stool bolted to the floor.  Five days later, on April 16, two weeks after discontinuing Dilantin, Dr. Johnson wrote Lowe a prescription for Keppra.

## II.

We review de novo a district court's grant of summary judgment.  *Shaw v. Foreman*, 59 F.4th 121, 129 (4th Cir. 2023).

## III.

### A.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A fact is 'material' if proof of its existence or non-existence would affect the disposition of the case under applicable law."  *Shaw*, 59 F.4th at 129 (quoting *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).  "An issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-movant."  *Id.* (quoting *Wai Man Tom*, 980 F.3d at 1037).  "The Court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party."  *Id.*

A party moving for summary judgment bears the initial burden of showing no genuine dispute of material fact exists.  *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018).  The movant may discharge this burden "by 'showing'— that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Smith v. Schlage Lock Co., LLC*, 986 F.3d 482, 486 (4th Cir. 2021) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  If the movant

4

satisfies this showing, the burden shifts to the nonmoving party to show a genuine issue of material fact for trial by offering "sufficient proof in the form of admissible evidence." *Variety Stores, Inc.*, 888 F.3d at 659 (quoting *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)). "Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion.  Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion." *Wai Man Tom*, 980 F.3d at 1037 (citation omitted).

"The Eighth Amendment's prohibition on 'cruel and unusual punishments' imposes certain basic duties on prison officials," including providing "adequate medical care." *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).  To establish a deliberate indifference claim, "the plaintiff must demonstrate that the defendant prison official acted with 'deliberate indifference' (the subjective component) to the plaintiff's 'serious medical needs' (the objective component)." *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  "The objective component of a deliberate indifference claim is satisfied by a serious medical condition." *Id.*  A "condition is serious when it has 'been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  *Id.* (quoting *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016)).

Subjective deliberate indifference "'entails something more than mere negligence' but does not require actual purposive intent." *De'lonta v. Johnson*, 708 F.3d 520, 525

5

(4th Cir. 2013) (quoting *De'lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003)). It requires that the official "subjectively 'knows of and disregards an excessive risk to inmate health or safety.'" *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Farmer*, 511 U.S. at 837). "[T]he standard is 'satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Gordon*, 937 F.3d at 357 (quoting *Farmer*, 511 U.S. at 835). "In the context of a claim related to the denial of medical treatment, a defendant 'acts with deliberate indifference if he had actual knowledge of the [plaintiff's] serious medical needs and the related risks, but nevertheless disregarded them.'" *Id.* (quoting *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018)).

"Once prison officials are aware of a serious medical need, they only need to 'respond[] reasonably to the risk.'" *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021) (quoting *Farmer*, 511 U.S. at 844). Indeed, "a prisoner does not enjoy a constitutional right to the treatment of his or her choice," so long as the medical treatment provided is adequate. *De'lonta*, 708 F.3d at 526. A mere "'[d]isagreement[] between an inmate and a physician over the inmate's proper medical care' . . . fall[s] short of showing deliberate indifference." *Jackson*, 775 F.3d at 178 (quoting *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985)). Rather, "the treatment given must be 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Hixson*, 1 F.4th at 303 (quoting *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990)).

Lowe asserts that Dr. Johnson was deliberately indifferent to his serious medical needs by discontinuing Dilantin without notice and delaying in prescribing Keppra for 14 days. As to discontinuing Dilantin, Dr. Amores reviewed Lowe's medical records and

6

found it reasonable to discontinue Dilantin because Lowe refused to have his blood drawn. And Dr. Amores stated that Keppra was an excellent alternative. Lowe contends that he was not warned that Dilantin was to be discontinued. But this is not supported by the record. It had been at least six months in April 2015 since Lowe had given blood. Lowe conceded that, in January 2015, after he told Dr. Johnson about his needle phobia, she said she would discontinue Dilantin and prescribe Keppra because that drug did not require blood testing. Therefore, we conclude that Dr. Johnson's decision to discontinue Dilantin was reasonable in light of Lowe's refusal to permit a blood draw and Dr. Amores' report detailing the risks associated with Dilantin if the patient's blood levels are unknown. Dr. Johnson did not have to provide Lowe with notice prior to discontinuing Dilantin, and her failure to do so does not rise to the level of deliberate indifference to Lowe's serious medical need.

## B.

Lowe's contention that the 14-day delay in prescribing Keppra constitutes deliberate indifference presents a different question. A delay in offering treatment for a serious medical need can be sufficient to establish a deliberate indifference claim. *Smith v. Smith*, 589 F.3d 736, 739–40 (4th Cir. 2009). Officials show deliberate indifference by intentionally delaying or denying the prisoner's access to adequate medical care or by ignoring an inmate's known serious medical needs. *See Estelle*, 429 U.S. at 104–05. "To establish liability based on a delay in medical treatment, a plaintiff must show deliberate indifference to serious medical needs that resulted in substantial harm." *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 422 (5th Cir. 2017).

7

Dr. Johnson discontinued Dilantin on April 2, 2015, and prescribed Keppra on April 16, 2015. During this 14-day period, Lowe suffered one, and possibly two, epileptic seizures. Lowe notified Dr. Johnson of the first seizure while she was treating him for an unrelated matter. The second seizure on April 11, 2015, caused injuries to Lowe's head and face. Even though Dr. Johnson knew that Lowe had epilepsy, that he had suffered a possible seizure days after she discontinued Dilantin, and that Dilantin had reduced the risk of seizures, she offered no medical reason why she waited 14 days to prescribe Keppra.

The district court granted summary judgment to Dr. Johnson on the issue of delay in treatment for two reasons. First, the court found that Lowe did not show it was unreasonable for Dr. Johnson to wait until she prescribed Keppra after she discontinued Dilantin and that Dr. Amores did not have an issue with the delay in prescribing Keppra. But Dr. Amores did not acknowledge in his report that there was a delay between prescriptions or note the date when Dilantin was discontinued. In fact, there is no evidence that Dr. Amores was even aware of a delay. Dr. Amores said that Dilantin was discontinued and Keppra was prescribed and that it was reasonable to prescribe Keppra. And he incorrectly stated that Keppra was prescribed on April 11, 2015, when the medical records showed that it was prescribed on April 16, 2015. There were no other medical experts, and Dr. Johnson did not offer any reason why she waited 14 days to prescribe Keppra.

Second, the district court determined that Lowe did not show that the delay in prescribing Keppra caused him to suffer any seizures. The court noted that Lowe had a seizure in February 2015, when he had a prescription for Dilantin, showing that he had

8

seizures whether he was taking Dilantin or not. But this finding is undermined by other record evidence, namely that Lowe states he did not take Dilantin the day before or the day of the seizure. Additionally, the level of Dilantin in Lowe's blood at the time of the February 2015 seizure was unknown, both due to Lowe's contention that he skipped doses and his most recent blood test being several months prior. Therefore, whether Lowe would have seizures while being treated or not is a material issue of fact to support denying summary judgment.

Additionally, after Dr. Johnson discontinued Dilantin, Lowe had two possible seizures within several days. One of the seizures resulted in injuries. And according to Lowe's medical records, Lowe had two seizures three days apart in 2010 before he began taking Dilantin to treat his seizures, and he did not have a documented seizure in more than three years prior to his seizure in February 2015. It appears from the record that Lowe was at greater risk of more frequent seizures if he was not being treated with an anti-seizure medication. "[W]hen the seriousness of an injury or illness and the risk of leaving that injury or illness untreated would be apparent to a layperson, expert testimony is not necessary to establish a deliberate indifference claim." *Scinto*, 841 F.3d at 230. Nothing in the record suggests that the 14-day delay in treatment was medically reasonable.

While the record reveals that Lowe suffered a seizure in February 2015, during the period when he was prescribed Dilantin, we conclude that, based on the present record, this does not lead to a finding that Lowe did not show the delay in prescribing Keppra in April 2015 led to two possible seizures. Lowe explained that he missed his Dilantin doses the day before and the day of the February 2015 seizure. And the record shows that Lowe

9

may have been at greater risk of seizures since the level of Dilantin in his blood was unknown. We conclude, therefore, that Lowe met his burden of showing a genuine dispute of material fact as to whether the delay in prescribing Keppra caused him to suffer two possible seizures during the period when he was not receiving any anti-seizure medication.

C.

The district court also granted summary judgment in favor of Rubenstein and Ballard. The record shows that Rubenstein and Ballard acted reasonably when Lowe notified them that he was at an increased risk of seizures because Dr. Johnson had discontinued Dilantin. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. A prison official's duty under the Eighth Amendment is to ensure 'reasonable safety.'" *Farmer*, 511 U.S. at 844 (quoting *Helling v. McKinney*, 509 U.S. 25, 33 (1993)). Being nonmedical prison officials, Rubenstein and Ballard forwarded Lowe's concerns to the prison's medical officials for review. And "a nonmedical prison official can generally defer to the decisions of prison medical personnel at the institutional level." *Gordon*, 937 F.3d at 358. Because it was reasonable for Rubenstein and Ballard to rely on the prison's medical personnel to choose the proper course of treatment for Lowe, we conclude that the district court properly granted summary judgment in their favor.

Accordingly, we affirm the district court's order and judgment granting summary judgment to Rubenstein and Ballard. We also affirm the district court's order granting summary judgment to Dr. Johnson on whether it was reasonable to discontinue Dilantin

10

after Lowe refused to have his blood drawn.  We vacate in part the district court's order on the issue of whether Dr. Johnson disregarded an excessive risk to Lowe's health and safety by waiting 14 days to prescribe Keppra, and we remand for further proceedings.  We deny Lowe's motion for appointment of counsel.  We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*